UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| HOPE FOWLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:05-cv-1243-LJM-WTL |
| | ) | |
| BANK ONE, | ) | |
| | ) | |
| Defendant. | ) | |

**Entry Discussing Motion for Summary Judgment**

As used in this Entry, "Fowler" refers to the plaintiff, Hope Fowler, and "Bank" or "the Bank" refers to the defendant, Bank One.  Bank One seeks resolution of Fowler's employment discrimination claim through the entry of summary judgment. Having considered the pleadings and the unopposed motion for summary judgment, and being duly advised, the court finds that the motion for summary judgment must be **granted.** This conclusion rests on the following facts and circumstances:

1. Fowler alleges in this action that the Bank terminated her employment on the basis of her race. She seeks damages. Her claim is asserted under both Title VII and 42 U.S.C. § 1981.

2. As noted, the Bank seeks resolution of Fowler's claim through the entry of summary judgment.

a. "Summary judgment is appropriate where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Westra v. Credit Control of Pinellas,* 409 F.3d 825, 827 (7th Cir. 2005) (quoting Rule 56(c) of the Federal Rules of Civil Procedure). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id.*

b. "'It is well-settled that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.'" *Sanders v. Village of Dixmoor,* 178 F.3d 869, 870 (7th Cir. 1999) (quoting *Liberles v. County of Cook,* 709 F.2d 1122, 1126 (7th Cir. 1983)). Fowler has not opposed the Bank's motion for summary judgment. Thus, the well-supported facts relied on by the Bank in support of its motion for summary judgment are accepted as true for the purpose of the court's resolution of that motion. *Corder v.*

*Lucent Techs., Inc.,* 162 F.3d 924, 927 (7th Cir. 1998); *Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir. 1994); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921-22 (7th Cir. 1994). This is the result of Local Rule 56.1(h), of which Fowler was notified.

3.     Title VII of the Civil Rights Act of 1964, as amended, prohibits "employers" from discriminating against individuals on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Section 1981 prohibits discrimination on the basis of race in the making and enforcement of contracts. 42 U.S.C. § 1981(a). A claim under § 1981 includes the same elements and employs the same analysis and methods of proof as a Title VII claim. *Johnson v. City of Fort Wayne,* 91 F.3d 922, 940 (7th Cir. 1996).

   a.     "It is well-established that a plaintiff in a Title VII case may proceed under a direct or indirect method of proof." *Butts v. Aurora Health Care,* 387 F.3d 921, 924 (7th Cir. 2004) (citing *Mateu-Anderegg v. School Dist.,* 304 F.3d 618, 623 (7th Cir. 2002)); see also *Stone v. City of Indianapolis Public Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

   b.     Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003); *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir. 1997). The direct evidence must show that the defendant said or did something indicating discriminatory animus with regard to the specific employment decision in question. *Id.* In short, "[d]irect evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" *Rogers,* 320 F.3d at 753 (citation omitted). "A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" *Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004)(quoting *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994)). "That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003).

   c.     Under the alternative method, in *McDonnell Douglas,* the Supreme Court "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory treatment cases." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993). The test consists of three steps. First, the plaintiff must establish a *prima facie* case of discrimination. Second, once the *prima facie* case is established, the defendant must state a legitimate, non-discriminatory reason for the adverse employment action. Finally, if a legitimate, non-discriminatory reason is offered, the plaintiff must come forward with evidence to show that the stated reason is not the true one, but only a pretext for discrimination. See *McDonnell Douglas,* 411 U.S. at 802-04; *DeLoach v. Infinity Broadcasting,* 164 F.3d 398, 401 (7th Cir. 1999).

4.     The evidentiary record in this action shows the following:

a. Fowler began her employment with Bank One in late 1992, while a high school student. She also worked with the bank for three summers while she was in college. In 2001, she returned to Bank One as a Customer Service Representative II, a position she held for about six months, before applying for and being accepted into the retail bank management program.

b. In May 2003, after completing the retail bank management program, Fowler became the Assistant Banking Center Manager of the Tower Branch. At that time, Fowler's supervisor was Michael Stillwell ("Stillwell"), who was Branch Manager for several branches. Stillwell afforded his Assistant Managers significant autonomy in running the branches where they worked.

c. Sometime in early March 2004, a customer came into the Bank with a non-Bank One check that he wished to cash. Fowler processed the transaction for the customer, but she failed to properly document the customer's identifying information on the check. The check was returned to Bank One due to a forged signature, resulting in a loss of $815 to the Bank. Stillwell verbally counseled Fowler on the need to follow the Bank's check-cashing policy to prevent such losses.

d. In March or April of 2004, Fowler transferred to the Maple Road branch at the request of Laura Boyer, the District Manager. According to Fowler, she was asked to transfer in order to assist Marsha Maxey ("Maxey"), the Branch Manager, "turn the place around." Maxey is a Hawaiian-American of Japanese descent.

e. From the start of her duties at the Maple Road branch, Fowler and Maxey "butted heads" and had differing opinions about managing the branch. Fowler freely concedes that she had a difficult time adjusting to having a direct supervisor and not being in charge of managing the branch. According to Fowler, she and Maxey discussed Fowler's concerns about Maxey's conduct, and although Maxey did not realize how Fowler perceived her conduct, she accepted Fowler's criticism as being constructive and endeavored to improve her conduct.

f. Shortly after Fowler transferred to Maple Road, a customer called the branch about a missing deposit. After being informed by Fowler that someone would return his call, the customer waited an hour and then called back to follow up on the situation. Dissatisfied with Fowler's response, which he described as "very snippy," the customer called the Office of the Chairman to complain about Fowler. The customer was offended and confused by the response he had received from Fowler while waiting for the Bank to investigate the matter. When Maxey returned from vacation, Laura Boyer informed her of the customer complaint, and Maxey, in turn, gave Fowler the opportunity to explain the situation and counseled Fowler.

g. In April 2004, Bank One conducted an internal audit at the Maple Road branch that raised several other concerns with Fowler's work performance. First, the audit revealed that Fowler did not follow the Bank's cash counting procedures. Second, Fowler failed to supervise the vault teller's work to ensure that she balanced the vault transaction receipts. Third, on at least one occasion, Fowler did not sign off the teller system after working as a teller.

h.  On April 23, 2004, a non-Bank One customer entered the Maple Road branch intending to open a new account. Marielle Allen ("Allen"), a Relationship Banker responsible for selling the Bank's retail products and services, initially met with this individual. Allen is Latin-American. The individual requested immediate access to $2,000, and as Allen was only authorized to release $100, she sought approval from Maxey. Maxey authorized a withdrawal of $500. Maxey also reminded Allen to ensure that the teller placed a hold on the opening deposit. At that point in time, Allen did not place holds on accounts, nor had she been trained on how to do so. After entering all the individual's information onto the Bank system, Allen took the individual to the teller station where Fowler was working temporarily as a bank teller.

i.  Fowler received the opening deposit, which was a non-Bank One check in the amount of $8,500. Allen reminded Fowler to place a hold on the deposit, as it was Fowler's responsibility to do so.

j.  Bank One's hold policy required holds to be placed on accounts so as to allow adequate time for items to be collected. For new customers, a hold placed through the Deposit Hold System is required on opening deposits, as well as a photocopy of the transaction to be kept at the branch. According to the hold policy, the opening deposit is to be given to the teller to validate the documents on the system and to provide the customer with a Deposit Review buckslip.

k.  Three days after Bank One opened the account, the individual emptied out the funds in the checking account. The check used to open the account was returned to Bank One as a counterfeit, resulting in a loss of $8,475, $7,975 of which was attributable to Fowler's failure to place the hold.

l.  After the loss occurred, Maxey conducted several searches of the hold system to determine if a hold was placed on the account. Her search revealed that no hold was placed. Maxey also contacted the Loss Operation Department for further research on the account, and was informed that the hold journal report for April 23, 2004, the day on which Fowler received the deposit, showed no evidence of a hold being placed on the system. The records from the date in question showed that the system flagged "Teller 01", who was Fowler, to place a hold on the system. However, "Teller 01" did not place a hold. Under the Bank One hold system, computer entries of hold messages indicate the employee number placing a message on the system, as well as the message itself. Even if the system erases or overrides a message, it retains a record of the message. No such message can be found for the account in question.

m.  On April 29, 2004, Brian Ferrell, Manager of the Loss Operation Department, placed a hold on the account due to a notice informing Bank One that the deposit check was being returned. Maxey conducted several searches into the situation and contacted Jenny Ingalls, Bank One's Fields Operations Coach, to have her conduct an additional search of the system to verify that Maxey had missed nothing in her own searches. None of these searches revealed a trace of a hold having been placed on the account.

n.  Bank One's policies on controllable losses, applicable to all employees including management, allow for different levels of corrective action, from advising and coaching to termination. The corrective action for a controllable loss of $2500.01 or more, is "to be determined by Retail Management in partnership with Human Resources and Corporate Security," regardless of whether the responsible employee was on corrective action for a previous infraction. Under the Bank's corporate guidelines, a controllable loss of $2,500 or more may be grounds for termination.

o.  After the Maple Road branch incurred the loss of $7,975, James Brocklehurst, the former Retail Manager, Laura Boyer, the District Manager, Maxey, the Branch Manager, and William Smith, an African American former Human Resources Business Partner, held several discussions about the proper corrective action to take against Fowler for the loss. These members of management collectively decided that terminating Fowler for the controllable loss was the appropriate course of action. As the Human Resources Business Partner, Smith reviewed the termination decision, which he found to comply with Bank One's policies, and signed the Recommendation for Termination. The size of the controllable loss as well as Fowler's position as Assistant Manager weighed in favor of termination.

p.  On June 2, 2004, Maxey and James Brocklehurst met with Fowler and informed her that the Bank was terminating her employment because of the $7,975 loss. During the meeting, Fowler claimed that she had, in fact, placed a hold on the account. Maxey called Corporate Security during the meeting to verify, yet again, that the check was counterfeit and that there was no copy of the deposit hold. Maxey asked Fowler to step outside while she and Brocklehurst called Ingalls, the Fields Operation Coach, to conduct another search of the deposit hold journal for any traces of a hold on the account.

q.  Maxey and Brocklehurst invited Fowler back into the meeting after confirming that the system contained no trace of a hold. Brocklehurst informed Fowler of the searches they had conducted while she had stepped outside and explained the seriousness of the situation. Brocklehurst asked Fowler to sign the Recommendation for Termination, which she refused to do. Maxey and Brocklehurst both signed the Recommendation for Termination.

5.  "Given that [Fowler] does not provide any direct evidence of discrimination on the basis of race, [s]he must proceed under the familiar four-part burden-shifting test established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 [ ] (1973) and refined in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 [ ] (1981)." Ballance v. City of Springfield, 424 F.3d 614, 617 (7th Cir. 2005).

> Under the *McDonnell Douglas* scheme, the plaintiff bears the initial burden of establishing a *prima facie* case. *McDonnell Douglas,* 411 U.S. at 802 [ ]; *O'Regan [v. Arbitration Forums, Inc.,* 246 F.3d 975,] 983 (7th Cir. 2001)].

*Id.* The *McDonnell Douglas* method "establishe[s] an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory treatment cases." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993). The test consists of three steps. First, the plaintiff must establish a *prima facie* case of discrimination. Second, once the *prima facie* case is established, the defendant must state a legitimate, non-discriminatory reason for the adverse employment action. Finally, if a legitimate, non-discriminatory reason is offered, the plaintiff must come forward with evidence to show that the stated reason is not the true one, but only a pretext for discrimination. *See McDonnell Douglas,* 411 U.S. at 802-04; *DeLoach v. Infinity Broadcasting,* 164 F.3d 398, 401 (7th Cir. 1999). The elements of a *prima facie* case of discrimination are these: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) the employer treated at least one similarly situated employee not in her protected class more favorably. *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1011 (7th Cir. 2004). With respect to this last element, it is the plaintiff's burden to present admissible evidence of a specific employee outside her protected class who was treated more favorably than she, *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003), and that employee must be "directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002).

  6. The *McDonnell Douglas* analysis yields the following:

  a. Fowler is African-American and her employment was terminated. These facts satisfy the first and third elements of a *prima facie* case.

  b. Fowler was culpable for the controllable losses identified in paragraph 4 of this Entry. Because of this, she was not meeting the Bank's legitimate expectations. This negates a showing of the second element of a *prima facie* case.

  c. There has been a complete failure of evidence as to the fourth element of a *prima facie* case of discrimination. *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 733 (7th Cir. 2004). That is, Fowler has not shown that a similarly situated non-minority employee was treated more favorably than was Fowler herself. Fowler's failure to satisfy the similarly situated prong is fatal to his *prima facie* case. See *Ezell v. Potter,* 400 F.3d 1041, 1049-50 (7th Cir. 2005).

  d. "Without a *prima facie* case, the plaintiff cannot withstand summary judgment." *Hong v. Children's Memorial Hosp.,* 993 F.2d 1257, 1261 (7th Cir. 1993), *cert. denied*, 511 U.S. 1005 (1994).

  e. Even if the court concluded otherwise with respect to the existence of a *prima facie* case here, the Bank has shown that the decision to terminate Fowler's employment was based on a legitimate, nondiscriminatory reason. That reason was Fowler's failure to adhere to the Bank's policies regarding the monitoring of deposits and the placing of a hold on newly opened accounts. Fowler has not shown, nor has she attempted to show, that this reason was a pretext for the termination of her employment. Pretext means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995); *see also Jordan v. Summers,* 205 F.3d 337, 343 (7th Cir. 2000) (to show pretext, plaintiff must present

evidence that each of the proffered reasons is either a lie or completely lacking a factual basis). Whether there was unfairness in the severity of the measure taken against Fowler, or whether in fact a different decision could reasonably have been made as a result of the investigation, are not questions which are material to the question of pretext or to any other question which must be addressed in this lawsuit. At this final stage of the *McDonnell Douglas* burden-shifting analysis, therefore, Fowler points to nothing which reasonably suggests that the reasons offered by the Bank for terminating Fowler's employment were lies to cover up race discrimination.

7.      The Supreme Court has explained that the purpose of Rule 56 is to "enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888 (1990). Through the process described above, "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton,* 523 U.S. 574, 600 (1998). "'It is well-settled that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.'" *Sanders v. Village of Dixmoor,* 178 F.3d 869, 870 (7th Cir. 1999) (quoting *Liberles v. County of Cook,* 709 F.2d 1122, 1126 (7th Cir. 1983)). "Employers may act for many reasons, good and bad; they may err in evaluating employees' strengths; unless they act for a forbidden reason, these errors (more properly, differences in assessment) do not matter." *Kuhn v. Ball State Univ.,* 78 F.3d 330, 332 (7th Cir. 1996). For the reasons explained above, Fowler has failed to meet this burden. Accordingly, the Bank's motion for summary judgment must be **granted.** Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 09/07/2006

LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana